# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Ronnie Jerome Jackson, III,                          Civ. No. 16-3831 (JRT/BRT)

        Plaintiff,

v.                                                   **REPORT AND**
                                        **RECOMMENDATION**

Jeff Gutzmer, Natalie Leseman, Michelle Smith,
Tammy Wherley, in their individual capacities; and
Tom Roy, in his official capacity,[1]

        Defendants.

---

Ronnie Jerome Jackson, III, OID #239471, MCF-Oak Park Heights, 5329 Osgood Ave. N., Stillwater, MN 55082, *pro se* Plaintiff.

Lindsay LaVoie, Esq., Assistant Attorney General, Office of the Attorney General, counsel for Defendants.

---

BECKY R. THORSON, United States Magistrate Judge.

     *Pro se* Plaintiff Ronnie Jerome Jackson is a prisoner detained at Minnesota Correctional Facility-Oak Park Heights ("MCF-OPH"). In this action, Plaintiff alleges that various staff members at the Minnesota Department of Corrections ("DOC") violated his First Amendment and due process rights by confiscating items containing nudity and/or sexually explicit images. Defendants move for summary judgment. (Doc. No. 74.)

---

[1]     In his Memorandum in Opposition to Defendants' Summary Judgment Motion, Plaintiff "voluntarily dismisses Tom Roy from being a Defendant in this action." (Doc. No. 86, Pl.'s Mem. 2.) Thus, it is not necessary to discuss any of Plaintiff's claims against Defendant Roy, and this Court will recommend dismissal of all such claims.

For the reasons stated below, this Court recommends that Defendants' Motion for Summary Judgment be granted.

## I.     Background

### A.     Consolidated Lawsuits Challenging DOC Policy on Nudity/Sexually Explicit Materials

In 2016 and 2017, Plaintiff brought three lawsuits in this district to challenge DOC's policies that prohibit offenders from possessing items containing nudity and/or sexually explicit materials. *See* Civil Case Nos. 16-3831, 16-4393, 17-1109. First, Plaintiff sued Defendants Jeff Gutzmer, Natalie Leseman, Michelle Smith, and Tammy Wherley in their individual capacities, alleging that DOC staff wrongfully confiscated photographs containing nude and/or sexually explicit images. (Case No. 16-3831, Doc. No. 1-1, Compl. ¶ 9.) In the second case, Plaintiff sued the same Defendants in their individual capacities, along with Roy in his official capacity, alleging that Defendants confiscated an art book with nude pictures. (Case No. 16-4393, Doc. No. 1, Compl. ¶ 7; *see also* Case No. 16-3831, Doc. No. 50-1.)[2] In the third case, Plaintiff sued Smith and Wherley in their individual capacities and Roy in his official capacity, alleging that Defendants confiscated an educational book called "Lighting the Nude." (Case No. 17-1109, Doc. No. 1, Compl. ¶¶ 1, 10; Case No. 16-3831, Doc. No. 50.) Chief Judge John R.

---

[2]     In his Memorandum, however, Plaintiff "voluntarily dismisses any and all claims in relation to the confiscation of his Art Book Catalog by the Defendants." (Doc. No. 86, Pl.'s Mem. 2.) Thus, it is not necessary to address any of the claims raised in the second case, and this Court will recommend dismissal of those claims.

Tunheim consolidated these cases on September 19, 2017. (Case No. 16-3831, Doc. No. 49.)[3]

Plaintiff alleges that on approximately August 19, 2016, he received twenty pictures in the mail, eight of which were denied as containing nudity per DOC policy. (Doc. No. 1-1, Compl. ¶ 9.) The following week, Plaintiff received forty more pictures in the mail containing twenty per envelope. (*Id.*) Out of one set of twenty, nine of the pictures were denied as being sexually explicit per DOC policy. (*Id.*) Of the other set of twenty, five of those pictures were denied as allegedly containing "nudity." (*Id.*) Plaintiff alleges that these five pictures were removed from his mail "under the false pretense they depicted nudity." (*Id.* ¶ 17.) Defendant Gutzmer's DOC records indicate that five photographs were confiscated on August 30, 2016, and were destroyed pursuant to DOC retention policy on November 17, 2016. (Doc. No. 79, Affidavit of Natalie Leseman ("Leseman Aff.") ¶ 30.) The photographs contained nude images and were considered a security risk. (Doc. No. 79, Affidavit of Tammy Wherley ("Wherley Aff.") ¶ 26.)

Plaintiff also alleges that, on or about March 7, 2017, property staff wrongfully confiscated a book titled "Lighting the Nude," Revised addition. (Doc. No. 50, Compl. ¶ 10.) This is an educational book that teaches how to take pictures of the nude form from abstract angles. (*Id.*) Plaintiff asked his family to order this book for him because he is interested in photographic art. (*Id.*) Property staff, however, informed Plaintiff that he could not have the book because it contained nudity prohibited by the DOC contraband

---

[3]    Unless otherwise specified, the Court references the document numbers in Case No. 16-3831.

3

policy. (*Id.* ¶ 11.) According to Defendants, a majority of the book's pages contained nude photographs. (Wherley Aff., Ex. B.)

Plaintiff requests compensatory damages, punitive damages, and an injunction requiring Defendants to give Plaintiff his book and five pictures, or to replace them if no longer available. (Doc. No. 1-1 at 9–10; Doc. No. 50 at 11–12.)

### B.     DOC Contraband Policy

Plaintiff challenges MN-DOC Contraband Policy 301.030 and Mail Policy 302.020. Policy 302.020 states that "[i]ncoming and outgoing mail, in whole or in part, is not authorized if it . . . contains contraband or pertains to sending contraband into or out of the facility." (Doc. No. 76, Affidavit of Natalie Leseman ("Leseman Aff.") ¶ 11, Ex. 1 at 6.) MN-DOC Contraband Policy 301.30 includes the definitions and procedures relating to "contraband." (*Id.*, Ex. 2 at 13–16.)

The MN-DOC Contraband Policy 301.030 identifies items that are not authorized within correctional facilities and provides procedures to follow regarding the identification and disposal of items containing contraband. An item is considered contraband if it poses a substantial likelihood of causing physical harm or jeopardizes the safe, secure, and orderly operation of the correctional facility. (*Id.*, Ex. 2 at 13.) Items containing nudity and sexually explicit materials are considered contraband. (*Id.*, Ex. 2 at 13–15.) Nudity is defined as follows:

> The showing (including see-through covering) of human male or female
> genitals, anus or pubic area or the showing (including see-through
> covering) of the female breast or a substantial portion of the breast below
> the top of the nipple. Examples of see-through coverings that are not
> permitted include "pasties," lace, mesh, and body paint through which the

covered area is showing; coverings emphasizing the depiction of human
genitals; or tight-fitting clothing through which the contours of the genitals
are clearly visible. This definition does not include published material
containing nudity illustrating medical, educational or anthropological
content.

(*Id.*, Ex. 2 at 13; *see also id.* at 14 ("Contraband/prohibited objects include such examples

as . . . Published and non-published materials (books, magazines, photos, drawings, etc.)

. . . Featuring . . . nudity, or sexually explicit written content where the central theme of

the item promotes contraband or prohibited content."). Also prohibited are—

Sexually explicit materials where the central theme of the item promotes
contraband or prohibited content (published or non-published) containing
any pictorial display or written descriptions of:

- direct physical stimulation of unclothed genitals,
- masturbation,
- sexual intercourse (including vaginal, oral, anal, or bestiality),
- bodily fluids,
- flagellation or torture in a sexual contest, and
- sex-related materials determined to constitute a risk to the safety
  and security of the facility, facilitate criminal activity, or
  undermine offender/resident rehabilitation.

(*Id.*, Ex. 2 at 14–15.)

Staff at the MCF-OPH inspect and process incoming and outgoing correspondence

pursuant to DOC Division Directive 302.020, entitled *Mail*. (Leseman Aff. ¶¶ 5–6,

Ex. 1.) Facility mail, legal mail, and non-legal offender mail are separated. (*Id.* ¶ 9.)

Every piece of incoming non-legal offender mail is opened, and the contents are removed

from the envelope. (*Id.*) Similarly, the MCF-OPH Property Department staff inspects and

processes incoming offender packages pursuant to DOC Division Directive 302.250,

entitled *Offender Property*. (Doc. No. 77, Affidavit of Donald Stiff ("Stiff Aff.") ¶¶ 3–4,

Ex. 1.) Incoming packages are examined by x-ray prior to being routed to the Property Department. (*Id.* ¶ 9.) Every package is opened and the contents are removed for inspection. (*Id.*) Each package is inspected to ensure it does not have any hidden weapons or contraband and the images do not violate the contraband policy. (*Id.*)

The DOC Contraband policy prohibits offender access to materials that are sexually explicit or contain nudity for three reasons. (Doc. No. 79, Affidavit of Tammy Wherley ("Wherley Aff.") ¶ 11.) First, when offenders access sexually explicit materials and materials containing nudity, it creates a security risk. (*Id.*) Second, these materials interfere with sex offender rehabilitation. (*Id.* ¶ 12.) Third, they create a hostile work environment for prison staff. (*Id.* ¶ 13.)

## II.    Analysis

### A.    Plaintiff's Claims

Plaintiff argues that the confiscation of five of the incoming pictures and the Lighting the Nude book was an "exaggerated to a legitimate penological interest as applied to those particular items," in violation of his First Amendment rights.[4] (Pl.'s Mem. 2.) Plaintiff further argues that he was denied due process when he challenged the

---

[4]    Plaintiff alleges that Defendants retaliated against him in violation of the First Amendment. (*See* Doc. No. 1-1, Compl.) In his summary judgment brief, however, Plaintiff "voluntarily dismisses any and all claims in relation to his allegation of defendants retaliation against him." (Pl.'s Mem. 2.) Therefore, Plaintiff has expressly waived his First Amendment retaliation claim.

confiscation of his photographs through the prison's grievance procedure. (*Id.*)[5]
Defendants argue that limiting offender access to nudity and sexually explicit materials
does not violate the First Amendment, and that Plaintiff's due process rights were not
violated. (Doc. No. 75, Defs.' Mem. 16–23, 27–31.) Defendants also argue that they are
entitled to qualified immunity, and that Plaintiff is not entitled to injunctive relief or
punitive damages. (*Id.* at 26–27, 31–35.)

### B.    Standard of Review

Summary judgment is appropriate if, "after viewing the evidence and drawing all
reasonable inferences in the light most favorable to the nonmovant, no genuine issues of
material fact exist and the movant is entitled to judgment as a matter of law." *Johnson v.
Carroll*, 658 F.3d 819, 825 (8th Cir. 2011) (quotation omitted). In ruling on a motion for
summary judgment, "[t]he evidence of the non-movant is to be believed, and all
justifiable inferences are to be drawn in his favor," because "[c]redibility determinations,
the weighing of the evidence, and the drawing of legitimate inferences from the facts are
jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
(1986). A disputed fact is material when its resolution "might affect the outcome of the

---

[5]    Plaintiff also alleged a violation of the Eighth Amendment. (*See* Doc. No. 50, ¶¶
25–28.) Plaintiff did not address this claim in response to Defendants' motion for
summary judgment, so it can be deemed waived. Moreover, possessing nude photographs
cannot be characterized as one of life's basic necessities for purposes of an Eighth
Amendment claim. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (Plaintiff
must have been deprived of the "minimal civilized measure of life's necessities").

suit under the governing law," and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

The party moving for summary judgment bears the initial burden of informing the court of the basis for its motion and identifying "those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." *Jackson v. United Parcel Serv., Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2001) (quotations omitted). If it does so, the non-moving party may not rest on mere allegations or denials, but must point to evidence of "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256; *see also* Fed. R. Civ. P. 56(c)(1). Conclusory assertions, standing alone, are not enough to create a genuine issue of material fact. *See Bennett v. Nucor Corp.*, 656 F.3d 802, 820 (8th Cir. 2011). Where the evidence "could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation omitted).

When deciding a summary judgment motion, courts liberally construe pro se pleadings and hold them to a less stringent standard than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Nevertheless, a pro se plaintiff's claims cannot survive a summary judgment motion unless he has set forth specific facts demonstrating that there is a genuine issue for trial. *See Quam v. Minnehaha Cnty. Jail*, 821 F.2d 522, 522 (8th Cir. 1987).

### B.   Prison Regulations and the Constitutional Rights of Prisoners

Prisoners retain their constitutional rights upon incarceration, but even so, limitations may be placed on the exercise of those rights in light of the needs of the penal system. *See Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979, 982 (8th Cir. 2004). Constitutional claims that would otherwise receive strict scrutiny analysis if raised by a member of the general population are evaluated under a lesser standard of scrutiny in the context of a prison setting. *See Turner v. Safley*, 482 U.S. 78, 81 (1987); *see also Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989).

In *Turner*, the Court considered prison regulations related to inmate marriages and inmate-to-inmate correspondence. 482 U.S. at 81. The correspondence regulation permitted correspondence with immediate family members who are inmates in other correctional institutions, and also permitted correspondence between inmates concerning legal matters. *Id.* Other correspondence between inmates was allowed if deemed within the parties' "best interest," but in practice, the rule was that "inmates may not write non-family inmates." *Id.* at 82. The marriage regulation permitted an inmate to marry only with the permission of the prison superintendent in "compelling circumstances," which was not defined, but "prison officials testified at trial that generally only a pregnancy or the birth of an illegitimate child would be considered a compelling reason." *Id.*

The Court recognized that its "task" was to "formulate a standard of review for prisoners' constitutional claims that is responsive both to the 'policy of judicial restraint regarding prisoner complaints and [to] the need to protect constitutional rights.'" *Id.* at 85 (quoting *Procunier v. Martinez*, 416 U.S. 396, 406 (1974)). After surveying previous

9

"prisoner's rights" cases, the Court stated that it did not apply a "standard of heightened scrutiny, but instead inquired whether a prison regulation that burdens fundamental rights is 'reasonably related' to legitimate penological interests, or whether it represents an 'exaggerated response' to those concerns." *Id.* at 87.

The Court identified "several factors" that are "relevant in determining the reasonableness of the regulation at issue." *Id.* at 89. First, courts ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it. *Id.* A regulation "cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Id.* at 89–90. Moreover, the governmental objective must be a legitimate and neutral one. *Id.* at 90. "We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." *Id.*

Second, courts consider whether there is an alternative means available to the prison inmates to exercise the right. *Id.* Where "'other avenues' remain available for the exercise of the asserted right, courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation.'" *Id.* (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 131 (1977) and *Pell v. Procunier*, 417 U.S. 817, 827 (1974)).

A third consideration is the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* at 90. Because a correctional institution is a "closed environment," any

changes are likely to have "ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order." *Id.* When accommodation of an asserted right will have a significant "ripple effect" on fellow inmates or on prison staff, "courts should be particularly deferential to the informed discretion of corrections officials." *Id.* (citing *Jones*, 433 U.S. at 132–33).

Finally, the "absence of ready alternatives is evidence of the reasonableness of a prison regulation," and by "the same token, the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Id.* This is not a "least restrictive alternative" test, and prison officials "do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.* at 90–91. "But if an inmate can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Id.* at 91.

Applying these factors, the Court found that the prohibition on correspondence was "reasonably related to valid corrections goals." *Id.* at 93. It was "content neutral," "logically advance[d] the goals of institutional security and safety identified by . . . prison officials, and [was] not an exaggerated response to those objectives." *Id.* The Court found that the marriage prohibition, however, was not reasonably related to the identified penological concerns of security and rehabilitation because it was an "exaggerated response to such security objectives" and there were "obvious, easy alternatives to the . . .

regulation that accommodate the right to marry while imposing a *de minimis* burden on the pursuit of security objectives." *Id.* at 97.

In *Thornburgh*, the Court applied the factors set forth in *Turner* to a prison regulation authorizing prison officials to reject incoming publications found to be detrimental to institutional security. 490 U.S. at 403. The regulation allowed the warden to reject a publication "only if it is determined detrimental to the security, good order, or discipline of the institution or if it might facilitate criminal activity." *Id.* at 404. A publication could not be rejected "solely because its content is religious, philosophical, political, social or sexual, or because its content is popular or repugnant." *Id.* at 405.[6] The Court explained that there was "little doubt" that this kind of censorship "would raise grave First Amendment concerns outside the prison context." *Id.* at 407. The Court found it "equally certain" that "prison walls do not form a barrier separating prison inmates from the protections of the Constitution," nor do they bar "free citizens from exercising their own constitutional rights by reaching out to those in the inside." *Id.* Those rights, however, "must be exercised with due regard for the 'inordinately difficult undertaking' that is modern prison administration." *Id.* (quoting *Turner*, 482 U.S. at 85).

Applying the first *Turner* factor, the Court held that the legitimacy of the Government's purpose in promulgating these regulations—protecting prison security—is "beyond question" and "'central to all other corrections goals.'" *Id.* at 415 (quoting *Pell*,

---

[6]      The regulations contained a nonexhaustive list of criteria which may support rejection of a publication, including, for example, if the publication is "sexually explicit material which by its nature or content poses a threat to the security, good order, or discipline of the institution, or facilitates criminal activity." *Id.* at 405 n.5.

417 U.S. at 832). Regarding neutrality, the Court noted that the ban on "*all* correspondence between certain classes of inmates at issue in *Turner* clearly met this 'neutrality' criterion." *Id.* (emphasis in original). The regulation in *Thornburgh* was different because the criteria for rejection turned "to some extent, on content." *Id.* The Court explained, however, that the reference to "neutrality" in *Turner* "was intended to go no further than its requirement in *Martinez* that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.'" *Id.* (quoting *Turner*, 416 U.S. at 413). Where "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Id.* at 415–16. Finally, the Court found that the "broad discretion" afforded by the regulations was rationally related to security interests. *Id.* at 416. Since publications can present a security threat, a more closely tailored standard "could result in admission of publications which, even if they did not lead directly to violence, would exacerbate tensions and lead indirectly to disorder." *Id.* The Court therefore found it "rational" to exclude materials that, "although not necessarily 'likely' to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time." *Id.* at 417.

Under the second *Turner* factor, whether there are "alternative means to exercising the right that remain open to prison inmates," 482 U.S. at 90, the Court explained that the "right" in question must be viewed "sensibly and expansively." *Id.* In *Turner*, for

13

example, it was "sufficient" that "other means of expression (not necessarily other means of communicating with inmates in other prisons) remained available." *Id.* at 418. This factor favored the regulations at issue because they permitted "a broad range of publications to be sent, received, and read." *Id.*

Applying the third factor, "the impact that accommodation of the asserted right will have on others (guards and inmates) in the prison," *Turner*, 482 U.S. at 90, the Court reasoned that the "class of publications to be excluded is limited to those found potentially detrimental to order and security," and "the likelihood that such material will circulate within the prison raises the prospect of precisely the kind of 'ripple effect' with which the Court in *Turner* was concerned." *Id.* Where the right in question "'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,'" *id.* (quoting *Turner*, 482 U.S. at 92), courts should defer to the "'informed discretion of corrections officials.'" *Id.* (quoting *Turner*, 482 U.S. at 90).

Finally under the fourth factor, a suggested alternative was tearing out portions of the publication and admitting the rest, but this approach was rejected based on the "reasonably found" fear that this would "create more discontent than the current practice." *Id.* at 418–19. When "prison officials are able to demonstrate that they have rejected a less restrictive alternative because of reasonably found fears that it will lead to greater harm, they succeed in demonstrating that the alternative they in fact selected was not an 'exaggerated response' under *Turner*." *Id.* at 419. Therefore, the Court found that the prison's regulations on incoming publications were facially valid under *Turner*'s reasonableness standard. *Id.*

These two cases, *Turner* and *Thornburgh*, set forth the framework to analyze the DOC's Contraband policy.

### C.    DOC Policies Limiting Access to Nudity and Sexually Explicit Materials Do Not Violate the Plaintiff's First Amendment Rights

#### 1.    First Factor: Valid Rational Connection

As noted above, the first *Turner* factor is "multifold." *Thornburgh*, 490 U.S. at 414. Courts "must determine whether the governmental objective underlying the regulations at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Id.*

Defendants offer three justifications for banning sexually explicit materials and materials containing nudity: they create a security risk, interfere with sex offender rehabilitation, and create a hostile work environment for prison staff. (Wherley Aff. ¶¶ 11–13.) First, sexually explicit materials and materials containing nudity create a security risk by contributing to inmate bartering and assaults. *See Smith v. Fabian*, Civil No. 10-2193 (JRT/TNL), 2012 WL 1004982, at *5 (D. Minn. Mar. 26, 2012). Second, these types of materials interfere with sex offender rehabilitation because once these materials enter a prison, they can find their way to sex offenders. *Id.* Third, they create a hostile work environment for staff by increasing the likelihood of sexual harassment and assault. *Id.* at *5–6. Securing the prison environment and promoting sex offender rehabilitation are legitimate penological interests. *See id.* at *5–6; *see also Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999); *Waterman v. Farmer*, 183 F.3d 208, 215 (3d Cir. 1999); *Dawson v. Scurr*, 986 F.2d 257, 260 (8th Cir. 1993). As courts have held previously, the

DOC's Contraband policy regarding nudity and sexually explicit materials are neutral and reasonably related to those interests. *See Hodgson v. Fabian*, 378 F. App'x 592, 594 (8th Cir. June 7, 2010); *see also Hodgson v. Roy*, Civil No. 11-243 (JNE/FLN), 2012 WL 3065386, at *1 (D. Minn. July 27, 2012); *Smith*, 2012 WL 1004982 at *5–6.

In his complaint, Plaintiff objected to the confiscation of the "Lighting the Nude" book because he wanted it for educational purposes due to his interest in photography. (Doc. No. 50, Compl. ¶ 10.) Thus, Plaintiff seems to be arguing that the DOC policy is not neutral because it permits inmates to possess classical works of art and educational books, but not if they include nudity or sexually explicit material. Under *Turner* and *Thornburgh*, the regulations are neutral, even though they are content-based. "Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which we meant and used that term in *Turner*." *Thornburgh*, 490 U.S. a 415–16; *see also Dawson*, 986 F.2d at 261 ("[W]hen prison administrators distinguish between publications on the basis of their potential implications for prison security and rehabilitation, as was done here, they are 'neutral.'"); *Waterman*, 183 F.3d at 215 ("Because the state's interest in rehabilitation is 'unrelated to the suppression of expression,' we conclude that the statute's purpose is neutral for purposes of [*Turner*].") (quoting *Turner*, 482 U.S. at 415). Plaintiff argues that confiscating his book was an "exaggerated response," but classic or educational works with nudity or sexually explicit images, just like other items, would have high value in prison and pose a security risk. (Wherley Aff. ¶ 29.)

Plaintiff also argues that the Court is unable to conduct an "independent review" to determine if there has been an "exaggerated response" by prison officials because the five confiscated photographs have been destroyed. (Pl.'s Mem. 3, 6–7 (citing and discussing *Murchison v. Rogers*, 779 F.3d 882, 888 (8th Cir. 2015)).) In *Murchison*, the court held that there must be an "independent review of *the evidence* to determine if there has been an exaggerated response to prison concerns in relation to" a particular item or items. *Id.* (emphasis added). This language does not mean that summary judgment is precluded if the Court is unable to review the photographs that were confiscated. Instead, summary judgment is appropriate "only if the prison officials present *some specific evidence* of why this particular item implicates prison concerns." *Id.* (emphasis added). Defendants submitted evidence that the photographs contained nude images and were considered a security risk. (Wherley Aff. ¶ 26; *see also* Doc. No. 42-1 (Notice of Non-Delivery of Mail/Package).) This is sufficient for the Court to conduct its independent review and determine that the confiscation of these photographs was not an exaggerated response.

### 2.    Second Factor: Alternative Means to Exercise the Right

DOC policy allows prisoners to receive a wide range of publications and images, subject to certain exceptions, such as the Contraband policy. (*See* Leseman Aff., Ex. 1 at 6.) Moreover, prisoners are not entirely precluded from receiving books with nude images. Publications are considered contraband only if "the central theme of the item promotes or 'features' nudity." (Wherley Aff. ¶ 17.) There is also an exception for published material that "illustrates medical, educational or anthropological content." (*Id.*

¶ 19.)[7] Therefore, offenders have alternative means to exercise their First Amendment rights under the second *Turner* factor. *See Thornburgh*, 490 U.S. at 418 ("As the regulations at issue in the present case permit a broad range of publications to be sent, received, and read, this factor is clearly satisfied.").

### 3.    Third Factor: Impact of Accommodation on Others in Prison

Allowing inmates access to sexually explicit and nude materials, as stated above, can increase the chance of assaults, thereby endangering prison guards and other inmate bystanders. Thus, under the third factor, the DOC's contraband policy is reasonably related to legitimate penological interests. *See Thornburgh*, 490 U.S. at 418 ("Where, as here, the right in question 'can be exercised only at the cost of significantly less liberty and safety for everyone else, guards and other prisoners alike,' the courts should defer to the 'informed discretion of corrections officials.'") (quoting *Turner*, 482 U.S. at 90, 92).

### 4.    Fourth Factor: Alternative Means of Exercising the Right

Plaintiff did not identify any feasible alternatives that would allow the DOC to achieve its goals of security and rehabilitation, while at the same time, allowing him access to sexually explicit and nude materials. *See Mauro*, 188 F.3d at 162 (explaining that the "burden is on the prisoner challenging the regulation, not on the prison officials, to show that there are obvious, easy alternatives to the regulation"). The absence of a ready alternative is further evidence that the DOC's Contraband policy is reasonable. *Turner*, 482 U.S. at 90.

---

[7]    "Lighting the Nude" was considered contraband because a majority of the book's pages contained nudity. (Wherley Aff. ¶ 25.)

**5.    The DOC Contraband Policy is Reasonable Under the *Turner* Factors**

Therefore, all four *Turner* factors demonstrate that the DOC Contraband policy is reasonably related to legitimate penological interests. *Turner*, 482 U.S. at 89. Defendants should be granted summary judgment on Plaintiff's First Amendment claim.

**C.    Due Process**

There are two types of rights secured by the due process clause of the Fourteenth Amendment: procedural due process rights and substantive due process rights. Because Plaintiff does not specify the type of due process violation he is alleging, the Court will address the requirements for both types of claims.

"Procedural due process imposes constraints on government decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To demonstrate that his procedural due process rights have been violated, Plaintiff must prove (1) that he had a protected liberty or property interest at stake, and (2) that Defendants deprived Plaintiff of this interest without due process of law. *See Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir. 1999).

Plaintiff argues that the Defendants violated his right to due process with respect to the non-delivery of five of his photographs. (Pl.'s Mem. 7–8.) Prisoners, however, do not have property interests in items designated as contraband by prison regulations. *See Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir. 1984) ("Because the property was contraband, [plaintiff] cannot seriously argue that he had a protected property interest in

19

it."); *see also Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) (explaining that "property interest claims by prisoners are . . . to be reviewed under *Sandin*'s[8] atypical-and-significant-deprivation analysis"); *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) (holding that regulation of the type and quantity of personal property inmates may possess in their cells is not an atypical, significant hardship of prison life); *Moreland v. Holderfield*, No. 1:12cv1132 (CMH/IDD), 2013 WL 6665716, at *5 (E.D. Va. Dec. 13, 2013) (finding that nude photographs "were contraband, and a prisoner has no constitutionally-protected property interest in contraband.").[9] Moreover, Plaintiff does not have a protected liberty or property interest in the use of a jail's grievance procedure. *See Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) ("A prison grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment.").

To establish a violation of substantive due process, a plaintiff must show (1) that the official violated one or more fundamental rights, and (2) that the conduct of the official was shocking to the "contemporary conscience." *Flowers v. City of Minneapolis*,

---

[8]    *See Sandin v. Conner*, 515 U.S. 472, 484 (1995).

[9]    To the extent that Plaintiff may be asserting a substantive due process claim, Plaintiff would need to show that the official violated one or more fundamental constitutional rights, and that the conduct of the executive official was shocking to the contemporary conscience. *Flowers v. City of Minneapolis*, 478 F.3d 869, 873 (8th Cir. 2007). The confiscation of nude materials to keep them from infiltrating the prison setting is not shocking to the contemporary conscience.

478 F.3d 869, 873 (8th Cir. 2007). The confiscation of nude materials to keep them from infiltrating the prison setting is not shocking to the contemporary conscience.

Therefore, Plaintiff cannot succeed on either type of due process claim, and Defendants are entitled to summary judgment.[10,11]

## RECOMMENDATION

Based on the foregoing, and also on the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants' Motion for Summary Judgment (Doc. No. 74) be **GRANTED**; and

2.    That judgment be entered accordingly.

Date: September 28, 2018.                    *s/ Becky R. Thorson*_____
                                             BECKY R. THORSON
                                             United States Magistrate Judge

---

[10]    Defendants argue that they are entitled to qualified immunity. Since Plaintiff cannot establish a constitutional violation in the first instance, it is not necessary to consider whether the right to be free from such a violation was "clearly established at the time of the alleged violation." *Tatum v. Robinson*, 858 F.3d 544, 547 (8th Cir. 2017).

[11]    Since none of Plaintiff's claims can survive summary judgment, Defendants are also entitled to summary judgment on Plaintiff's requests for injunctive relief and punitive damages. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (to secure a permanent injunction, a plaintiff must demonstrate "irreparable injury" and that "remedies available at law, such as monetary damages, are inadequate to compensate for that injury").

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b)(1), a party may file and serve specific written objections to this Report within **fourteen days**. A party may respond to those objections within **fourteen days** after service thereof. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).